**Neil R. COLA, Plaintiff, Appellant,**

v.

**Charles H. REARDON, Sheriff of Essex County, Defendant, Appellee.**

**No. 85–1324.**

United States Court of Appeals, First Circuit.

Argued Sept. 12, 1985.

Decided March 26, 1986.

---

Stephen M. Perry with whom Thomas D. Edwards and Casner, Edwards & Roseman, Boston, Mass., were on brief, for plaintiff, appellant.

Francis L. Robinson, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This is an appeal from the denial of a habeas petition filed by Neil R. Cola to challenge his state court conviction under a Massachusetts statute. Appellant's central contention is that he was not convicted by a jury but rather by a state appellate tribunal on a theory of guilt never raised at trial. Thus, because due process requires guilt to be determined based on the case as presented to the jury, Cola argues that his conviction was unconstitutionally affirmed on a theory of guilt not set forth at trial. Due to the Supreme Court's decision in *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), and because we are constrained to apply the Massachusetts Appeals Court interpretation of state law, we are compelled to grant appellant's request for the issuance of a writ of habeas.

As a result of the complex factual and legal background involved in this case, our opinion will be divided into the following four sections: (1) the factual background as presented at trial; (2) the rationales of the Massachusetts Appeals Court and the district court below; (3) analysis of appellant's due process claim; and (4) issues raised by the Commonwealth on appeal.

## I. FACTUAL BACKGROUND

On December 7, 1982, appellant Cola, then an attorney employed by the Massachusetts Department of Revenue, was charged under separate indictments with two violations of the state's conflict of interest statute, Mass.Gen.Laws ch. 268A. The first indictment ("the financial interest indictment") charged Cola with violating Mass.Gen.Laws ch. 268, § 6, by participating in a matter in which he and his family had a financial interest. The second, ("the agency indictment"), accused him of violating Mass.Gen.Laws ch. 268A, § 4(c), by acting as agent for someone other than the Commonwealth of Massachusetts in a matter in which the Commonwealth and a state agency was a party and had a direct and substantial interest. The charges related to certain business dealings that Cola had become involved in with a friend named Michael Rapp.

After a seven day jury trial in Suffolk Superior Court, Cola was convicted of both charges. His motion for a new trial was denied. For the financial interest conviction Cola was fined $3,000, and for the agency conviction he was sentenced to one year in prison. On appeal to the Massachusetts Appeals Court, both convictions were affirmed, and the Supreme Judicial Court denied Cola's application for further review.

Cola then filed a habeas petition in the United States District Court for the District of Massachusetts, challenging only his conviction under Mass.Gen.Laws ch. 268A, § 4(c) (the agency conviction). He claimed essentially that he had been denied due process because the state appellate court affirmed his conviction under § 4(c) on grounds that were never specified in the indictment nor presented to the jury. Cola also claimed that the court's charge to the jury was faulty in that it did not frame the

charge in terms by which the jury could have found Cola guilty of the § 4(c) violation.

The district court rejected Cola's argument, holding that there was no variance between the indictment as limited by the bill of particulars, the proof at trial, and the basis on which the state appeals court upheld the conviction. In short, the district court found that the theory of guilt upon which the state appeals court affirmed *had* been set forth in the indictment and at trial. Additionally, since the appellant had made no objections to the jury instructions at the time they were given, the district court found that he had clearly waived any right to object under state law.[1] Mass.R. Crim.P. 24(b); *Commonwealth v. Pope*, 15 Mass.App.Ct. 505, 466 N.E.2d 741 (1983).

For purposes of this review, we will set out the most pertinent facts as we have found them in the record, and in the light most favorable to respondent, the Commonwealth of Massachusetts. Given that the principal stages of trial—the government's proof, the prosecutor's opening and summation, and the judge's charge—essentially focus on two transactions, a $30,000 loan/second mortgage and a $10,000 loan/payback, our discussion will be likewise divided.[2] After reviewing facts or proof adduced at trial, we will also examine the extent to which the indictment, as reduced by the bill of particulars, corresponds to such proof or any other theory of guilt.

### 1. The $30,000 loan to Rapp and second mortgage to John Volpe

While employed as an attorney in the compliance bureau of the Massachusetts Department of Revenue, Neil Cola became acquainted with Michael Rapp, who had visited Cola's office in 1976 with respect to tax difficulties in Rapp's business. Rapp controlled Framingham S & S Corporation, which operated the Sea and Surf Restaurant in Framingham, Massachusetts. The restaurant was seriously delinquent in its payment of meals taxes owed to the Commonwealth. Cola was the attorney for the Commonwealth in charge of collecting such taxes.

Rapp also controlled a related corporation, Framingham Food Services, Inc., which was likewise tax delinquent, these being local property taxes owed to the town of Framingham. Cola was not assigned to collect such property taxes. The town, independently of any action by Cola, threatened to revoke the restaurant's liquor license on December 31, 1979 if the property taxes were not paid. As the Massachusetts Appeals Court noted, the revocation of the liquor license would not only hamper the restaurant's future profitability, but was "an act calculated to cast a pall over the New Year's revels of seven to eight hundred patrons expected by Rapp at that climactic hour." *Commonwealth v. Cola, supra*, 468 N.E.2d, note 2 at 1097.

In order to avert this eventuality, Rapp filed a Chapter 11 petition for a reorganization, which the Bankruptcy Court granted. In addition to providing for the automatic stay sought by Rapp, the court assigned a federal trustee to oversee the operations of the restaurant. Naturally this situation was undesirable to Rapp for it interfered with his previous autonomous control of his operations.

Rapp realized that he could probably persuade the Bankruptcy Court to remove the trustee if he could deposit with the court $30,000 to protect the business' unsecured creditors. At this point, Cola offered to loan Rapp the money in exchange for a $30,000 interest in a second mortgage on the real estate on which the restaurant sat.

---

**1.** The Massachusetts contemporaneous objection rule provides: "No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, specifying the matter to which he objects and the grounds of his objection." Mass.R.Crim.P. 24(b).

**2.** A more extensive recapitulation of the testimony adduced at trial can be found in the state appeals court decision, *Commonwealth v. Cola*, 18 Mass.App.Ct. 598, 468 N.E.2d 1094 (1984).

Cola arranged with his co-worker John Volpe for the mortgage to be held in the name of Utopia Realty Trust, of which Volpe was trustee. All this time Cola had been assigned to represent the Commonwealth's interests in the bankruptcy proceeding involving Rapp's restaurant.

The hearing on Rapp's motion to remove the trustee was held on January 8, 1980. Immediately prior to the hearing, in the hallway outside the courtroom, Cola delivered to Rapp's attorney a cashier's check for $30,000. Rapp's attorney then presented this check to the court. In response to the court's inquiry, the motion to remove the trustee was opposed by both a representative of the United States Internal Revenue Service and the trustee in the chapter 11 reorganization. The trustee later testified that Cola—who was present throughout the hearing and who had previously been assigned to represent the Commonwealth interests therein—stated to the judge that the Commonwealth had no objections to the removal of the trustee. Cola disputed this, asserting that he had remained silent and was merely in the courtroom as an observer on his lunch hour. Cola further stated he did not represent the interests of the Commonwealth during the time he set aside for lunch. Respondents refer to this as Cola's "lunch hour defense."

The trustee was then removed by the court. Rapp eventually repaid the $30,000 to Cola six months later in June of 1980. The unsecured creditors, by contrast, were never paid. Rapp's tax debt continued to escalate at a rate of six to nine thousand dollars per month. In April of 1981, Rapp converted the chapter 11 proceeding to a chapter 7 liquidation. At that time, his unpaid tax obligation to the Commonwealth exceeded $400,000.

2. *The $10,000 loan/payback*

In September of 1980, while the chapter 11 proceeding was still pending, Rapp again needed cash, which Cola volunteered to help him procure. It is disputed whether Rapp expressed his need for the $10,000

only after Cola called Rapp to collect a $2,000 payment due to the Commonwealth. Regardless of his motivation, Cola subsequently contacted John Volpe, who agreed to lend Rapp $10,000 in exchange for a $1,000 premium.

On September 10, 1980, Cola and Volpe brought the $10,000 in cash to the Sea and Surf restaurant and gave it to Rapp. Rapp, in a separate transaction with a gentleman named Garabedian, then exchanged the $10,000 plus some stock owned by Rapp for a $20,000 cashier's check provided by Garabedian. The cashier's check was made out to Cola. Rapp gave the check to Cola. Cola then went to a bank, cashed the check, and distributed the $20,000 as follows: $11,000 to Volpe to repay his loan and pay the premium; $2,000 to the Commonwealth of Massachusetts; $3,500 to Boston Edison; and the remaining $3,500 to Rapp in cash.

3. *The indictment and bill of particulars*

With the above background of the evidence presented at trial, we turn to consider one aspect of Cola's claim, that not only was the appellate theory of guilt at odds with the proof at trial, but that it was at odds with (and hence, not forewarned by) the indictment as narrowed by the bill of particulars. The "agency indictment" generally followed the language of the Massachusetts statute, and read as follows:

> NEIL R. COLA, a state employee, commencing at a time in or about the month of December, 1979 and continuing from time to time and on different occasions as opportunity therefore should offer until a time in or about the month of September, 1980 at Boston in the County of Suffolk, and at other diverse locations both within the County of Suffolk and without, *while being a state employee not in the proper discharge of his official duties did act as agent or attorney for someone other than the Commonwealth in connection with a particular matter in which the Commonwealth*

*and a state agency is a party and has a direct and substantial interest.*[3]

(Emphasis added).

Cola's motion for a bill of particulars requested that the prosecution make the following clarifications:

1. The identity of the party for whom the defendant is alleged to have acted as agent or attorney other than the Commonwealth.

2. *The acts of the defendant which he performed as a state employee between December, 1979 and September, 1980 which were not in the proper discharge of his official duties.*

3. The identification of the "particular matter" in which the Commonwealth was a party and had a direct and substantial interest as a "judicial or other proceeding, application, submission, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, decision, determination, finding."

4. The identification of the direct and substantial interest of the Commonwealth in the particular matter referred to in the indictment.

5. The means by which the Commonwealth alleges the offenses were committed.

(Emphasis added).

The Commonwealth answered as follows:

1. Michael Rapp, Framingham Food Services, Inc.

2. *The defendant acted as an agent [1] for Framingham Food Services, Inc. in granting a second mortgage to Utopia Realty Trust ... [2] for Michael Rapp in obtaining a loan from one John Volpe [and] ... [3] for Framingham Food Services, Inc. in the payment of debts of the corporation, other than to the Commonwealth.*

3. The collection of taxes due the Commonwealth of Massachusetts.

4. The payment of taxes due the Commonwealth of Massachusetts.

5. The defendant's representation of the interests of Framingham Food Services, Inc. and one Michael Rapp.

Further than this, the Commonwealth is unable to particularize at this time.

(Emphasis added).

The indictment and the bill of particulars must be read together and the indictment is limited by the government's clarifications. *Commonwealth v. Leavitt,* 17 Mass.App.Ct. 585, 595, 460 N.E.2d 1060 (1984); *Commonwealth v. Albert,* 307 Mass. 239, 243, 29 N.E.2d 817 (1940). Cola's central contentions on appeal are two. First, he contends that nowhere in the indictment or in the bill of particulars did the Commonwealth allege that Cola's wrongful act of agency pertained to actions by him at the bankruptcy proceeding. Thus, since Cola's actions at the bankruptcy proceeding were, in his view, the appellate court's theory of guilt, he asserts that such theory was improperly omitted from the indictment (as narrowed by the bill of particulars).

Second, Cola argues that of the three acts of agency alleged by the government in paragraph "2," only the first two—[1] that Cola acted as agent for Framingham Ford Services Inc. in granting a second mortgage to Utopia Realty Trust, and [2] that Cola acted as Rapp's agent in obtaining a loan from Volpe—were the subject of the government's proof at trial. Cola further asserts that these two acts—respectively, the $30,000 and $10,000 loan transactions described above—were also the focus of the prosecutor's opening statement, his summation, and the thrust of the court's charge to the jury. Accordingly, Cola argues that the Commonwealth's theo-

---

**3.** The statute under which Cola was convicted provided:

"No state employee shall, otherwise than in the proper discharge of his official duties, act

... as agent ... for anyone in connection with any particular matter in which the Commonwealth ... has a direct and substantial interest." Mass.Gen.Laws ch. 268A, § 4(c).

ry of guilt on the agency indictment was based solely on the loan transactions.

The due process problem, argues Cola, arose in the course of his appeal. For the Massachusetts Appeals Court, in reviewing Cola's claims of error below, seems to have held that Cola's participation in the loan transactions was no crime at all. Rather, the crime was Cola's behavior at the bankruptcy proceeding where, by not protesting the removal of the trustee, Cola in effect acted as Rapp's agent.

Cola's argument, then, is not necessarily that his behavior at the bankruptcy proceeding was not a crime. Neither does he dispute the fact that evidence on the matter was before the jury. Rather, Cola claims that such evidence was incidental vis a vis the prosecutor's case or theory of guilt as presented to the jury. This theory of guilt, argues Cola, was the loan transactions found by the state appellate tribunal to be no crime. Accordingly, citing the Massachusetts Appeals Court, Cola asserts that the acts or theory of guilt upon which he was tried did not constitute a crime. Further, citing *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), Cola asserts that the state appeals court, in upholding his conviction on a theory of guilt not presented at trial, violated his due process right to have such guilt determined on a basis set forth in the indictment and presented to the jury.

Before addressing Cola's claim and the government's rebuttal to it, we find it necessary to set forth the exact holdings of the Massachusetts Appeals Court and the district court below.

## II. THE HOLDINGS OF THE MASSACHUSETTS APPEALS COURT AND THE DISTRICT COURT BELOW

### A. *The state appeals court*

Cola's arguments to the state appeals court were essentially three: (1) he challenged the sufficiency of the government's evidence; (2) he claimed errors in the judge's instructions to the jury; and (3) he

claimed error in denial of his motions for a required finding of not guilty as to each indictment. To support his view of error by the trial court, Cola alleged that the proof at trial and the judge's instructions focused on the loan transactions, acts which because they were allegedly never connected to a particular government interest in the collection of taxes, could not in Cola's view be crimes under 4(c). Moreover, Cola objected to what he regarded as a theory of guilt concocted by the prosecutor only for purposes of the appeal; namely, that Cola's illicit act of agency was not only his participation in the loan transactions but his "covert representation" of Rapp at the bankruptcy proceeding.

For purposes of this habeas petition, the relevant portions of the Appeals Court decision are those addressing Cola's objections to the judge's instructions and the legal and factual basis for the conviction under the agency indictment.

### 1. *The judge's instructions*

The Appeals Court rejected Cola's challenge to the judge's instructions to the jury on the ground that Cola's trial counsel had negotiated the content of the charge, apparently consented to it, and then remained silent when presented with two different opportunities at trial to object. Thus, citing the Massachusetts contemporaneous objection rule,[4] the court noted that, given Cola's failure to object at trial, the only residual question would be whether the charge, viewed as a whole, would create a substantial risk of a miscarriage of justice. *Commonwealth v. Cola, supra*, 468 N.E.2d at 1099. While the court found certain defects in the charge, it nonetheless noted that the judge described the relevant statutes with reasonable accuracy, which "taken with the Commonwealth's powerful evidence," led the court to conclude it unlikely the jury had been misled by any defects. *Id.*

---

**4.** *See* note 1, *supra*, for text of rule.

### 2. *The agency indictment*

The appellate court began this portion of its opinion by restating, in its words, the essence of the prosecutor's case as supported by the evidence at trial: that "Cola acted for Rapp and S & S (i.e., someone other than the Commonwealth) to minimize and delay the payment of state taxes (i.e., a particular matter in which the Commonwealth had a direct and substantial interest) ..." *Id.*, 468 N.E.2d at 1101. This "tax minimization" role of Cola's, which the court regarded as satisfying the elements of the agency indictment, was established in the court's view by the following three acts of Cola:

> ... [1] by filing returns for [Rapp] calculated to keep the tax collector at bay; [2] by encouraging discharge of the trustee in the c. 11 reorganization, who was paying taxes; and [3] by passing up opportunities to apply the loan proceeds to the reduction of tax arrearages.

*Id.*

The court proceeded to notice a "difficulty." This was that the Commonwealth, both in its bill of particulars and in its theory of guilt as evidenced by the prosecutor's opening and summation, did not emphasize the acts regarded by the appellate court as most clearly constituting a crime. Rather, the court noted, the Commonwealth appeared to focus solely on the $30,000 and $10,000 loan transactions, as though Cola's participation in these, by itself, would constitute a 4(c) violation. *Id.* But Cola's participation in the loan transactions, under the Appeals Court opinion, did *not* constitute criminal conduct. The theory of guilt based on the loan transactions, said the Appeals Court, was "faulty." [5] *Id.* 468 N.E.2d at 1101–1102.

The Massachusetts Appeals Court was then faced with a dilemma. On the one hand, it had conceded that the focus of the government's proof had been the loan transactions, and that the theory of guilt based on such transactions was "faulty." So, the bulk of Cola's trial focused on non-criminal behavior. On the other hand, the Appeals Court reviewed the record and found testimony regarding acts committed by Cola that *did* constitute a crime, namely, his failure to object to the removal of the trustee and consequent covert representation of Rapp at the bankruptcy proceeding. Hence the dilemma, for under *Dunn v. United States, supra,* it is a violation of due process to affirm a conviction on a basis neither set forth in the indictment nor presented to the jury at trial. Thus, the Appeals Court, to survive scrutiny under *Dunn,* had to establish that its theory of guilt—covert or dual representation at the bankruptcy proceeding—*was* indeed set forth in the indictment and *was* presented to the jury as a focus of the government's case. [6]

As to whether Cola's actions at the bankruptcy proceeding were the subject of the indictment as narrowed by the bill of particulars, the appellate court points to the third item mentioned in the bill of particulars, that Cola "acted as an agent for Framingham Food Services, Inc. in the payment of debts of the corporation, other than to the Commonwealth." *Id.*, 468 N.E.2d at 1102. Properly noting the identity of interest and arguably sham distinctions between all the Rapp corporations, the Appeals Court read the above quote as in effect stating that Cola had generally acted as *Rapp's* agent (and not merely the agent of Framingham Food Service, Inc.) in the payment of debts other than to the Commonwealth, a general concept within

---

**5.** We are bound to apply a state appellate court's statement of local law. *See Tarrant v. Ponte,* 751 F.2d 459 (1st Cir.1985); *Missouri v. Hunter,* 459 U.S. 359, 368–371, 103 S.Ct. 673, 679–81, 74 L.Ed.2d 535 (Jan. 19, 1983); *O'Brien v. Skinner,* 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974). We therefore are compelled to accept that, given the Appeals Court opinion,

Cola's participation in the loan transaction was not a crime under § 4(c).

**6.** As elaborated in Part IV below, we reject an interpretation of *Dunn,* suggested by the Commonwealth here, that it suffices to find the appellate theory in the indictment *or* the proof at trial. Rather, we regard *Dunn* as requiring both.

which the actions at the bankruptcy proceeding were apparently included. *Id.*

Having satisfied itself that the indictment, as narrowed by the bill of particulars, stated the crime with sufficient specificity, the Appeals Court proceeded, without elaborating on the context, to summarize the prosecutor's case as follows:

> In outlining the theory of the government's case in his opening ... the prosecutor said the evidence would show Cola was not collecting delinquent taxes, that Cola represented the interests of the Commonwealth in the Bankruptcy Court proceedings at the same time that he procured funds for Rapp's corporation and produced them at the Bankruptcy Court in a context disadvantageous to the Commonwealth's tax collection efforts, and that through his actions the Rapp interests received favorable treatment in the tax collection proceedings. When he summarized the evidence in his closing, the prosecutor argued expressly that the evidence had demonstrated that Cola had represented "the interests of S & S and Michael Rapp" at the Bankruptcy Court on a date when it was his obligation "to represent the interests of the [S]tate" and that, more generally, the evidence had shown "that while Mr. Cola was a representative of the Commmonwealth, a [S]tate employee, he acted on behalf of Michael Rapp ... [Paraphrasing the statute], he acted as an agent for someone other than the Commonwealth in a particular matter in which the Commonwealth has an interest."

*Id.*, 468 N.E.2d at 1102.

The above characterization of the prosecutor's case led the court to conclude that Cola had indeed been tried on a theory of guilt based on his actions at the bankruptcy proceeding, a theory that, to the apparent exclusion of any other, would be adopted by that court on appeal.

Cola's argument in this habeas petition, then, is simply to challenge the Appeals Court's finding that the dual representation theory of guilt, based on his actions at the bankruptcy proceeding, was indeed before the jury. Moreover, Cola challenges the finding that the appellate theory was encompassed by the indictment as narrowed by the bill of particulars. Before addressing these issues, it is first necessary to set out the resolution offered by the district court below.

### B. *The district court opinion*

Cola's habeas claim to the district court was essentially the same as that before us. Cola argued that the Appeals Court affirmed his conviction under § 4(c) on a theory of guilt not specified in the indictment, bill of particulars, prosecutor's opening or summation, or the judge's charge to the jury. Each of these elements of the trial, Cola argued to the district court, revealed the government's central theory of guilt—and in turn the only case before the jury—as focusing on the loan transactions as violative of § 4(c), and not on the "dual representation" theory, which in Cola's view, the Appeals Court wrongly concluded to have been set forth at the trial.

In the early portion of its opinion, the district court appeared to reject the Appeals Court finding that the case was presented to the jury so as to direct their attention to Cola's dual representation at the bankruptcy hearing. *Cola v. Reardon*, No. 85–225–S, slip op. at 6 (D.C.Mass. March 26, 1985). In short, the district court found that, contrary to the Appeals Court's assertions, the proof at trial for the most part focused on the loan transactions by themselves, and not on the bankruptcy proceeding. *Id.* Additionally the district court noted that the judge's charge, while again focusing on the loan activity, was in fact so vague that the jury returned with the following question:

> If, now that we have heard all the testimony and the charge to the jury, are we free to decide guilt or innocence on any basis whatsoever (except, of course, for being paid off for a vote)?

*Id.*

Despite its apparent conclusion that the case presented to the jury did not focus on conduct found by the Appeals Court to be

criminal—and by implication, that the Appeals Court unconstitutionally affirmed Cola's conviction on a basis not set forth at trial—the district court denied Cola's petition in a three-step argument, respectively addressing: (1) the indictment as narrowed by the bill of particulars; (2) the prosecutor's opening and closing; and (3) the judge's charge to the jury.

1. *The indictment as narrowed by the bill of particulars*

Regarding the indictment as narrowed by the bill of particulars, the district court noted Cola's second request in his motion for particulars:

> 2. The acts of the defendant which he performed as a state employee ... which were not in the proper discharge of his official duties.

As noted above, the Commonwealth responded to this with its restatement of Cola's acts in the two loan transactions as the improper acts of agency, as well as a third act, relied on by the Appeals Court, that Cola had acted as an agent for one of Rapp's corporations in paying debts other than to the Commonwealth.

The district court, however, did not adopt the Appeals Court conclusion that the third act encompassed the "dual representation at the bankruptcy proceeding" theory. Rather, the district court held that, because Cola's request was not directed to the operative words of the charge, the Commonwealth's reply did not operate to limit the scope of the indictment.[7]

Any miscommunication between Cola and the government was clarified, in the district court's view, by Cola's fifth request in his motion for a bill of particulars:

> 5. The means by which the Commonwealth alleges the offenses were committed.

The Commonwealth responded:

> 5. The defendant's representation of the interests of Framingham Food Services, Inc. and one Michael Rapp.

The district court then asserted that the Appeals Court was correct in stating that "there was ample evidence of violations of § 4(c) which were within the scope of this specification." *Id.* at 8. Regrettably, the district court did not explain what "the scope of this specification" was, or more particularly, whether the specification, in alleging "representation" as the illegal act of "agency," did anything more than vaguely restate the indictment. Apparently, in the district court's view, adequate notice of the appellate theory was a foregone conclusion.[8] Instead, the district court viewed the issue before it as whether "ample evidence" had been presented at trial to support the appellate theory. Even on this latter issue, the district court did not state what this "ample evidence" was nor did it reveal how such ample evidence was related by the prosecutor to the Appeals Court "dual representation" theory. Finally, the district court did not explain how such a conclusion—i.e., ample evidence as to the dual representation theory—could be reconciled with its earlier assertion that the proof at trial predominantly focused on the noncriminal loan transactions. Instead of addressing any of these issues, the district court abruptly concluded that "[t]here was, accordingly, no variance between the indictment as limited, the proof at trial, and the basis on which the Appeals Court upheld the conviction." *Id.*

2. *The prosecutor's opening and closing*

Presumably, in his arguments before the district court, Cola noted that, under *Dunn v. United States, supra,* examination of the prosecutor's closing statement (and by implication, also his opening) was proper as

---

**7.** To arrive at this conclusion, the district court noted the statement in the indictment, "while being a state employee not in the proper discharge of his official duties did act as agent," and characterized the phrase "did act as agent" as the operative words of the charge. Thus, when Cola inquired as to acts "not in the proper

discharge of his official duties," he was inquiring as to acts which are not necessarily crimes without the additional notion of agency. *Id.* at 7–8.

**8.** We address this issue in Part IV below.

a means of determining whether the appellate theory of guilt was indeed before the jury. As to the prosecutor's opening, the district court felt it *did* reflect the appellate theory, and hence did not regard it as presenting any problems under *Dunn,* for two reasons. First, although the district court had earlier characterized the prosecutor's references to the bankruptcy proceeding as "passing," it nonetheless concluded that "[i]t is arguable at least that the last 15 lines encompassed the matters which the Appeals Court found supported the conviction." Thus, the district court implicitly regarded "arguable" references by the prosecutor to the appellate court theory as satisfying the *Dunn* requirement that the appellate theory correspond to the proof at trial. Second, the district court concluded, without citation, that any deficiency—presumably even a deficiency under *Dunn* —was waived because the sufficiency of the opening statement was never challenged by a motion for a required finding of not guilty. *Id.* at 9. In arriving at this conclusion, the district court did not address Cola's contention that the constitutional error to which he objected—an appellate tribunal affirmance on a theory not set forth at trial—had not yet occurred, and that therefore, to impose upon Cola the obligation to object *prior* to any constitutional error would be to require unrealistic powers of foresight.

As to the prosecutor's closing argument, the district court again noted any connection to the Appeals Court theory to be tenuous. The court regarded the connection, if any, to be "almost exclusively" to the loan transactions by themselves. *Id.* Despite these observations, the district court could find no requirements for closing arguments apart from the prohibition against improperly prejudicial statements. Accordingly, it concluded that the prosecutor could well have waived closing or sung "Columbia, the Gem of the Ocean" without affecting the legal sufficiency of the case presented to the jury. *Id.* By implication, we suppose, the district court rejected Cola's contention that "Columbia, the Gem of the Ocean" was all *anyone* had sung at

his trial, and that, therefore, to affirm on a different theory of guilt would violate due process.

### 3. *The judge's charge to the jury*

The district court plainly states that the judge's charge to the jury only focused on Cola's actions with respect to the loans, and hence, did not address criminal behavior. *Id.* at 9, 11. However, on this issue the district court followed the Massachusetts Appeals Court, and, citing the state's contemporaneous objection rule, noted that any right of Cola's to object to the trial court's instructions on appeal was waived by his failure to object at trial. Thus, stated the district court, Cola's failure to object at trial, absent a showing of cause and prejudice, precluded him from challenging the jury instructions in a petition for *habeas corpus. See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *McLaughlin v. Gabriel,* 726 F.2d 7, 9 (1st Cir.1984). Accordingly, because the district court found no showing of cause as required by the above cases, it disallowed Cola's claim. *Id.* at 10. In conclusion, however, the court noted that were it not for its application of the contemporaneous objection rule, it would have granted Cola's writ, since the charge clearly indicated the case presented to the jury to be one focusing solely on the noncriminal loan transactions. *Id.* at 11.

### III.   ANALYSIS

We begin by noting that Cola's habeas petition, which in essence asserts a due process claim, is not before us under our federal supervisory powers. Rather, Cola challenges a state appellate tribunal's affirmance of his conviction. Given that federal courts have no supervisory powers over state judicial proceedings, federal intervention is not proper here to correct mere imperfections but only to correct "errors of constitutional dimension." *See, Lacy v. Gabriel,* 732 F.2d 7, 12 (1st Cir. 1984); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982).

The similarities between the present case and *Dunn v. United States, supra,* are worthy of notice. *Dunn* involved a federal perjury statute, Title IV of the Organized Crime Control Act of 1970, 18 U.S.C. § 1623, which prohibits false declarations made under oath "in any proceeding before or ancillary to any court or grand jury of the United States." The issue, apart from the due process discussion, was how to define "ancillary" proceedings such that false statements made would subject the declarant to § 1623. Thus, as with the present case, *Dunn* originated with a debate over how to define criminal conduct.

Along with the background of a statute subject to differing interpretations, the defendant Dunn, similar to Mr. Cola, had committed more than one act. Dunn had essentially lied on two occasions, once in a lawyer's office on September 30 and again in an October 21 evidentiary hearing where, for the most part, he adopted the September 30 statements.

The indictment charging Dunn with perjury under § 1623 mentioned only the September 30 statement, and not the statement of October 21. At trial, the government centered its proof on the September 30 statement. The government also presented evidence, although not significant, on the October 21 statement.[9] Unlike Cola, Dunn objected at trial to the admission of the October 21 statement and renewed his objection in a motion for acquittal. To support this latter motion, Dunn's argument was similar to Cola's in the state appeal. Dunn contended that the September 30 statement, the focus of proof at trial, was not made in the requisite "ancillary proceeding," and hence, was not a crime at all.

On appeal, the Tenth Circuit agreed with Dunn that the September 30 statement was no crime. However, noting the September 30 and October 21 statements to be "inextricably related," the court concluded that Dunn had clearly been on notice as to the latter, and that therefore, any variance between the indictment (only September 30) and the proof at trial (September 30 and October 21) was not fatal.

The Supreme Court, in reviewing the Tenth Circuit's decision, disapproved of any characterization of the issue as a variance issue. Indeed, because the Court regarded the proof at trial as centrally focusing on the September 30 statement, it saw no variance at all. Both the indictment and the proof at trial involved September 30. The problem involved fundamental due process concepts of notice and trial by jury, which led the Court to state:

> To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused. See *Eaton v. Tulsa,* 415 U.S. 697, 698–699 [94 S.Ct. 1228, 1229, 39 L.Ed.2d 693] (1974) (per curiam); *Garner v. Louisiana,* 368 U.S. 157, 163–164 [82 S.Ct. 248, 251, 7 L.Ed.2d 207] (1961); *Cole v. Arkansas,* 333 U.S. 196, 201 [68 S.Ct. 514, 517, 92 L.Ed. 644] (1948); *De Jonge v. Oregon,* 299 U.S. 353, 362 [57 S.Ct. 255, 259, 81 L.Ed. 278] (1937). There is, to be sure, no glaring distinction between the Government's theory at trial and the Tenth Circuit's analysis on appeal. The jury might well have reached the same verdict had the prosecution built its case on petitioner's October 21 testimony adopting his September 30 statement rather than on the September statement itself. But the offense was not so defined, and appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial.

*Id.,* 442 U.S. at 106–07, 99 S.Ct. at 2194–95.

---

**9.** This evidence was in the form of rebuttal to Dunn's assertion that he had not made the September 30 statement.

■ We are hard-pressed to distinguish the present case from *Dunn*. Frankly, we also see "no glaring distinction" between the theory of the Massachusetts Appeals Court and the proof at trial. The "dual representation" appellate theory *can* be adduced from the facts. But it was not the government's focus, or as *Dunn* requires, "the theory on which the case was tried and submitted to the jury." *Id.*, 442 U.S. at 106, 99 S.Ct. at 2194. Reference to the dual representation theory, if ever made explicit, was only incidental. The *Dunn* Court regarded tangential references to the October 21 statement as insufficient because, in the Court's view, the prosecution did not "build its case" on such evidence. *Id.* Subsequently, in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1979), the Supreme Court regarded isolated phrases or side-references to the appellate theory as also constitutionally insufficient. *Id.* at 237 n. 21, and at 239, 100 S.Ct. at 1119 n. 21, and at 1120 (Brennan J., concurring). Thus, we believe that, in order for any appellate theory to withstand scrutiny under *Dunn*, it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon reviewing the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense.[10]

■ Accordingly, while we concede that evidence supporting the dual representation theory was before the jury, we cannot find any basis for concluding that the prosecution "built its case" on such evidence. In short, no meaningful attempt was made to *relate* the evidence to the theory adopted on appeal. Thus, the evidence supporting the appellate theory, as well as the appellate theory itself, were at best incidentally present, or better put, not coherently present at all.

■ We arrive at the conclusion that the Massachusetts Appeals Court's theory was only incidentally before the jury based on the very analysis set forth in *Dunn* and *Chiarella*. While the Court in *Chiarella* focused largely on the judge's charge, the *Dunn* Court, in order to determine the exact case or theory of guilt presented to the jury, looked to both the summations of the prosecutor and defense counsel as well as the judge's charge to the jury. Because we view the essence of any inquiry under *Dunn* as addressing the principal stages of trial—i.e., that which constitutes "the theory on which the case was tried and presented to the jury"—we will, in addition to reviewing the prosecutor's summation and the judge's charge, somewhat broaden our inquiry to include the prosecutor's opening statement.[11]

1. *The prosecutor's opening and closing statements*

The Massachusetts Appeals Court found that the prosecutor, in his opening and summation, adequately presented the dual representation theory of guilt. We disagree. As to the prosecutor's opening, we agree with the district court below that the references to the bankruptcy proceeding were at best arguable. We discern no difference between the "arguable" references here and side-references. Accordingly, because as a matter of law mere side-references by the prosecutor do not suffice to place a theory before the jury, we conclude that the prosecutor's opening was constitutionally infirm. *See, Dunn, supra,* 442 U.S. at 106–07, 99 S.Ct. at 2194–95, and

---

**10.** We find the district court's tentative statement of the rule also quite helpful: "the case ... [must have been] presented to the jury in a manner which directed their attention to the conduct which the Appeals Court found violative of the statute." *Cola v. Reardon, supra* at 6. The district court noted that this had not been done but nonetheless ruled for the Commonwealth. *Id.* at 6, 11–12.

**11.** We note that because we find the appellate theory not to be meaningfully present in *any* of the principal stages of trial, we need not decide the issue of whether certain stages, specifically, the judge's charge and the prosecutor's summation, deserve more scrutiny or weight than others. However, we do decide that, in order for evidence supporting the appellate theory to be given weight, such evidence must be *related* by the prosecutor to the appellate theory, and not left unexplained. *See* pp. 699–700, *infra.*

see also Chiarella, supra, 445 U.S. at 237 n. 21, 239, 100 S.Ct. at 1119, n. 21, 1120 (Brennan, J., concurring) ("[a]mbiguous suggestions in the indictment and the prosecutor's opening and closing remarks are no substitute for the proper instructions").

As to the prosecutor's closing, we again reject, for reasons stated more fully in Part IV below, the Appeals Court's paraphrasing of the prosecutor's statements, which in our view disguises the import and incidental nature of the references to the bankruptcy proceeding. Moreover, as to the district court's justification for not considering what it regarded as a summation "almost exclusively" addressing noncriminal conduct—that, except for the prohibition on prejudicial statements, the prosecutor is largely unrestricted in his summation—we cannot agree in this instance. The summation is one of various factors that must be considered in inquiries under Dunn as to the case before the jury. Thus, while prosecutors may be free to waive closing or sing "Columbia the Gem of the Ocean," they must beware when such becomes the nature of their case, and especially, when such is not the case affirmed by an appellate tribunal.

### 2. The judge's charge to the jury

As to the judge's charge to the jury, we note that the judge in Dunn, similar to Cola's judge, most competently described the statute at issue. However, also like Cola's judge, the trial judge in Dunn proceeded to discuss the noncriminal acts alleged by the prosecution in its indictment, thus implying that these could serve as the basis for a guilty verdict. Finally, as in Chiarella, the judge in Cola's trial tangentially referred to the conduct later found by the Appeals Court to be criminal; however, we reiterate that an isolated phrase in the instructions, which arguably implies the appellate theory, does not suffice to present the appellate theory to the jury. Id. at 237 n. 21, 100 S.Ct. at 1119 n. 21. Thus, under both Dunn and Chiarella, the judge's

charge here did not sufficiently reflect the appellate theory.

We now come to perhaps the most central error committed by the Appeals Court and the district court below, for while both looked upon the trial judge's instructions as not framing the issues in a manner that would define criminal conduct, both precluded Cola from raising any objection on appeal due to his failure to so object at trial. The Massachusetts Appeals Court in part properly applied the contemporaneous objection rule, since, at that level of the proceedings, Cola's objection was partly to the charge itself. However, the Appeals Court should have noted Cola's further objection to a theory of guilt that, in Cola's view, the prosecutor had concocted solely for the purposes of appeal. Accordingly, it was incumbent upon the Appeals Court to apply the aforementioned inquiry under Dunn, where different principal stages of the trial—such as the prosecutor's summation and the judge's charge to the jury—are examined not for the purpose of finding inherent error but for resolving the "evidentiary" inquiry of determining the exact case before the jury.

■ In short, to apply the contemporaneous objection rule to due process challenges under Dunn is to misunderstand the nature of the error complained about. In the traditional contemporaneous objection situation, the error inheres in the judge's charge; thus, it is reasonable to require objection at the time of the error. In the Dunn situation, however, the error inheres in the appellate court affirmance; thus, the error has not yet occurred at the time of the judge's charge. Accordingly, to require defendants to object to appellate tribunal errors prior to the appellate opinion itself is, in our view, to impose unreasonable demands of foresight.[12] See, e.g., Dlugash v. State of New York, 476 F.Supp. 921, 925 (E.D.N.Y.1979).

We note that, in Chiarella, the Supreme Court eschewed affirmance upon conclud-

---

12. This is especially so where, as here and as in Chiarella, the appellate court's theory of guilt

involves a novel or otherwise not easily anticipated view of criminal liability.

ing that certain factors, such as an *unobjected* judge's charge, indicated the theory at trial to be contrary to that offered on appeal.[13] Thus, the Massachusetts Appeals Court should likewise have taken cognizance of the unobjected judge's charge as evidence of the case before the jury, and, in our view, concluded that the Commonwealth's proposed theory on appeal was, unfortunately, a novel one with respect to the trial.

Consideration by us of the charge, then, is not for the purpose of finding error in it, but rather, in the limited context of due process challenges under *Dunn*, to determine the nature of the case before the jury, a determination that we note is only partially affected by the charge itself. Accordingly, the reliance of both the Appeals Court and the district court on the state contemporaneous objection rule was erroneous. Regrettably, such reliance prevented at least the district court from pursuing its inclination to find error in the appellate court affirmance based on a theory not set forth at trial.

## IV. ISSUES RAISED BY THE COMMONWEALTH

Apart from asserting that the Appeals Court's "dual representation" theory of guilt was before the jury, the Commonwealth posits four other reasons for us to deny Cola's habeas petition. First, the Commonwealth offers an interpretation of *Dunn* whereby due process would be satisfied if *either* the indictment *or* the proof at trial corresponds to the appellate theory; thus, because the Commonwealth regards the indictment as encompassing the appellate theory, it urges us to uphold on that basis alone. Second, the Commonwealth

points out that on habeas review, our role is only to correct errors of constitutional dimension and not mere imperfections; thus, since Cola's claim is allegedly a complaint against mere imperfections, we should not grant his petition. Third, the Commonwealth asserts that the Appeals Court's conclusion—that its theory of guilt was before the jury—is a "finding of fact" entitled to a presumption of correctness under 28 U.S.C. § 2254(d), and more importantly, that the record does not reveal such presumption to be overcome. Fourth, the Commonwealth argues that it can invoke and prove both of the permitted rebuttals to traditional "variance" claims of defendants, i.e., (i) that Cola was nonetheless on notice of the dual representation theory and, accordingly, prepared an adequate defense, and (ii) that Cola is protected from being retried for the same offense. We address each of the above claims in turn.

1. *Whether the indictment, if it touches upon the appellate theory, can by itself defeat a due process challenge under Dunn*

The Commonwealth's claim here is twofold: first, it asserts that the indictment, as narrowed by the bill of particulars, encompassed the appellate theory; and second, it argues that, accordingly, the indictment by itself can defeat a due process challenge under *Dunn*.

We believe that assertions as to a nexus between the indictment and the appellate theory are soundly refuted by examining the disagreement between the Appeals Court and the district court as to *where* in the bill of particulars the appellate theory can be found.[14]

---

**13.** Chief Justice Burger in his dissent noted that "experienced defense counsel" did not object to the charge. *Id.*, 445 U.S. at 244, 100 S.Ct. at 1123. None of the other Justices, however, mentioned this as relevant. Indeed, given the focus of the majority on the charge as evidence of the case before the jury, it seems clear that, probably for the reasons elaborated above, they viewed the lack of objection at trial as immaterial.

**14.** As noted above, the Appeals Court relied on the third alleged act of agency set forth in paragraph 2, that Cola had acted as an agent for one of Rapp's corporations in the payment of debts other than to the Commonwealth. This statement, in the Appeals Court's view, encompassed its tax minimization theory, as well as the act of dual representation at the bankruptcy proceeding.

The district court, perhaps because it accepted Cola's contention that the above third act of

Although we accept the conclusion of the Appeals Court that paragraph 2 provides the relevant particular, we reject the conclusion that the third alleged act of agency in paragraph 2—the payment of the debts of one of Rapp's corporations other than to the Commonwealth—encompasses the appellate theory.[15] The reason for our conclusion is that, in order to deduce a connection between this third act of agency and Cola's actions at the bankruptcy proceeding, one must engage in too many cognitive leaps. The real reference of the third act, in our view, is either a general restatement of the indictment with a hint that the trial involves Rapp's corporate tax debt, or, it is a second reference to the $10,000 loan transaction, where Cola distributed the proceeds of a $20,000 check to various parties and only in part to the Commonwealth. In neither case, however, do we see a persuasive link to the tax minimization theory, and certainly not to Cola's actions at the bankruptcy proceeding (the latter arguably being the crux of the appellate theory).[16]

■ Even if we were to accept the Appeals Court's conclusion that the third alleged act of agency set forth in paragraph 2 implicitly encompasses the appellate theory, we nonetheless hold that *Dunn* requires the appellate theory to be set forth in both the indictment *and* the case presented to the jury. The relevant statement in *Dunn* is the following:

> To uphold a conviction on a charge that was *neither* alleged in an indictment *nor* presented to the jury at trial offends the most basic notions of due process.

(Emphasis added). *Id.* 442 U.S. at 106, 99 S.Ct. at 2194.

■ The Commonwealth interprets the above quote as only requiring the appellate theory to be present *either* in the indictment *or* in the proof at trial. Thus, argues the Commonwealth, so long as the appellate theory is mentioned in the indictment, convictions could be upheld despite the total lack of proof or argument by the prosecutor on such theory at trial. In short, prosecutors could sing "Columbia the Gem of Ocean," never mention the appellate theory at trial, and still obtain a conviction by concocting their real case on appeal. Under the Commonwealth's view, such a prosecutorial waiver of trial would not violate due process, since the only process allegedly due to defendants is to have the appellate theory set forth in the indictment. This cannot be the law, for in addition to notice, due process requires a trial in which criminal defendants are able to confront the government's case. *See Jackson v. Virginia*, 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979) ("It is axiomatic that a conviction upon a charge not made

agency did not encompass the appellate theory, chose not to follow the Appeals Court reasoning and held that none of paragraph 2—which included references to the $30,000 and $10,000 transactions—could be regarded as limiting the scope of the indictment "because the request was not directed to the operative words of the charge." *Id.* at 8. The *real* particularization of the agency indictment, said the district court, could be found in the Commonwealth's statement in paragraph 5, that the illicit act of agency was "[t]he defendant's representation of the interests of Framingham Food Services, Inc. and one Michael Rapp." *Id.* In other words, the district court concluded that the relevant particular was not the paragraph involving the $30,000 and $10,000 loan transactions (which essentially were the focus of all the proof at trial), but rather, that it was a paragraph stating that the defendant's illicit acts of agency were his acts of representing Rapp (or, his acts of agency). Thus, because we do not see the redundancy of paragraph 5 as providing any

meaningful particularization of the indictment, and because we, therefore, regard the statements in paragraph 2 as providing more relevant notice, we reject the district court's contention that paragraph 5 should be our focus and that it encompasses the appellate theory.

15. The full text of the bill of particulars (including paragraph 2) is set forth at p. 686, *supra*.

16. As noted below, the Commonwealth repeats this assertion of notice to Cola by arguing a contention not explicitly accepted by either of the courts below, that all along Cola expected and effectively defended against the appellate theory. Since our review of the record indicates that Cola's defense does *not* indicate knowledge or constructive notice of the appellate theory, the Commonwealth's assertion that the indictment provided actual notice is, in our view, even more suspect.

*or* upon a charge not tried constitutes a denial of due process.") (emphasis added); *see also Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1947). Thus, to allow appellate affirmance of convictions without inquiry as to the proof at trial is to seriously risk denials of due process, notwithstanding the signals given by the government in its pretrial indictment.

Our view of the requirements of due process is, of course, by no means novel. However, it is also important to note that our conclusion follows not only from *Dunn* but from *Chiarella,* where, in addition to being concerned with concepts of notice, the Court indicated a like concern for sixth amendment guarantees of confrontation and trial by jury. Thus, in explaining its reluctance to give weight to incidental, side-references at trial to the appellate theory, the *Chiarella* Court stated the proposition that courts may not uphold convictions if it is impossible to ascertain whether the defendant has been punished for noncriminal conduct. *Id.* 445 U.S. at 237 n. 21, 100 S.Ct. at 1119 n. 21 citing *United States v. Gallagher,* 576 F.2d 1028, 1046 (3rd Cir. 1978); *Leary v. United States,* 395 U.S. 6, 31–32, 89 S.Ct. 1532, 1545–46, 23 L.Ed.2d 57 (1969); *Stromberg v. California,* 283 U.S. 359, 369–70, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931). The reason for such a proposition, we believe, and the reason *Dunn* requires the appellate theory to be present in the indictment *and* the proof at trial, is a fundamental sixth amendment concern that guilt be initially adjudicated before a jury based on the government's case as presented at trial.

Accordingly, because we regard due process as requiring the appellate theory to be set forth in both the indictment and the proof at trial, and because we find the references at trial to the appellate theory to be at best incidental, we reject the Commonwealth's contention that due process can be reinstated through references (here implicit) to the appellate theory in the indictment. Finally, we note that this conclusion, as well as our conclusion that the indictment provides no meaningful notice

of the appellate theory, are endorsed by the Supreme Court in *Dunn.* There, the basis of the Tenth Circuit's affirmance was that, while the indictment did not *specifically* mention the acts found criminal on appeal, adequate notice and an opportunity to defend could nonetheless be *implied,* given that the act mentioned in the indictment was "inextricably related" to that found criminal on appeal. The Supreme Court rejected this analysis out of hand, its reason essentially being that, despite interpretations of implicit references in the indictment, the proof at trial corroborated a more plain reading of the document, which did not at all encompass the appellate theory. Thus, at the least, the Supreme Court endorsed a rule that, where the proof and elements of trial clearly do not reflect the appellate theory, the constitutional infirmity cannot be overcome by transcendental views of the indictment's message. Because we do not think the prosecution's case at trial reflected the appellate theory here, and because we regard the Commonwealth's interpretations of the indictment to be at best transcendental, we need go no further here than the holding in *Dunn.* Accordingly, we merely reiterate that where the prosecution's case at trial does not meaningfully reflect the appellate theory, due process cannot be reinstated through implicit references in the indictment.

2. *Whether the error involved in this habeas petition is of constitutional magnitude*

As noted above, our role in reviewing habeas petitions from state tribunals is only to correct errors of constitutional magnitude, and not "mere imperfections." *See Lacy v. Gabriel, supra; Smith v. Phillips, supra.* We have here found a violation of due process under *Dunn.* The *Dunn* Court referred to the error before it as offending one of "the most basic notions of due process." *Dunn, supra* 442 U.S. at 106, 99 S.Ct. at 2194. Such violations, in our view, are errors of constitutional di-

mension. Accordingly, we reject the Commonwealth's contention here.

3. *The Appeals Court decision and the presumption of correctness under § 2254(d)*

The Commonwealth's basic claim here is that the Appeals Court's conclusion—that its theory of guilt was submitted to the jury—is a "finding of fact" entitled to a presumption of correctness under 28 U.S.C. § 2254(d) and *Sumner v. Mata*, 455 U.S. 591, 702 S.Ct. 1303, 71 L.Ed.2d 480 (1982). We agree, for purposes of argument, that the inquiry under *Dunn* as to the "theory of guilt" before the jury could be characterized as a factual matter.[17] Even assuming a presumption of correctness is attached to the Appeals Court finding, we nonetheless reject the Commonwealth's argument on two grounds. First, as a matter of "fact," we find that any presumption is overcome by significant evidence—some of which the Appeals Court improperly regarded as not before it, and the rest of which the Appeals Court paraphrased out of context—indicating that the case was presented only in terms of the loan transactions. Second, as a matter of law, even accepting the finding, essential to the Appeals Court's conclusions, that there was ample evidence before the jury corroborating the appellate theory, we hold that, absent a presentation by the prosecutor *relating* such evidence to the appellate theory, due process is nonetheless abridged.

As to our first point, we note that the Appeals Court, because it applied the state contemporaneous objection rule, did not consider the judge's charge as evidence of the case before the jury. However, we have already concluded that, in inquiries under *Dunn* as to the case before the jury, consideration by us of the charge is both proper and required. Accordingly, our conclusion that the case before the jury did *not* involve a focus on the appellate theory is based on a consideration of evidence that the state appellate tribunal improperly regarded as not before it.[18]

In addition to our consideration of the judge's charge, we regard any § 2254(d) presumption overcome as a factual matter based on our independent review of the record. As to the prosecutor's closing argument, we note that, upon close examination of the brief references to the bankruptcy proceeding, it becomes clear that these references were made in the context of the financial interest indictment, and not

---

**17.** We also note, however, that the "facts" found by the Appeals Court were statements by witnesses regarding Cola's action at the bankruptcy proceeding and side-references by the prosecutor and the trial judge to the appellate theory. These statements or "facts" are in the record before us just as they were before the Appeals Court. Accordingly, an argument could be made that the Appeals Court, in finding its theory of guilt to be "before the jury," was in effect attaching *legal* significance to facts not in dispute in this habeas petition. In other words, the Appeals Court's finding that its theory had been submitted to the jury could be characterized as a legal one involving analysis, supposedly under *Dunn,* of the due process significance of undisputed statements made by witnesses, the prosecutor and the judge. However, instead of entering the legal quagmire of questions of fact versus questions of law and "mixed" questions, we prefer here to give the Commonwealth the benefit of any doubt, and, given the separate sovereignty implications of federal habeas review of state tribunals, will accord the Appeals Court's finding a presumption of correctness under § 2254(d).

**18.** The fact that the trial judge's charge presented the wrong theory of guilt, and the impact of that charge on the case before the jury, is revealed by the district court's final observation that, were it not for the contemporaneous objection rule, it would grant Cola's writ. *Cola v. Reardon, supra,* at 12. In *Chiarella,* likewise, the Court's conclusions as to the case before the jury were largely, if not solely, based on the judge's charge. *Chiarella, supra,* 445 U.S. at 231, 236, 100 S.Ct. at 1116, 1118–19.

Thus, while we do not opine here as to the relative weight to be attributed to the judge's charge as affecting the case before the jury, we nonetheless note that *Chiarella* and the district court's observations bolster both (i) our interpretation of the charge as not effectively setting forth the appellate theory, and (ii) our conclusion that the charge, when accepted as evidence of the case before the jury, can significantly impact upon a court's conclusions, and thus, casts serious doubt over those of the Appeals Court.

in the context of the agency indictment. Thus, the prosecutor's references to the bankruptcy proceeding were not only brief, but were *never* related, as the Appeals Court said they were, to the agency indictment context. Accordingly, we agree with the observation of the district court that the prosecutor's closing statement makes no plain reference to the appellate theory, or, that if any reference can be inferred, it is at best incidental. Since, as a matter of law, incidental references by the prosecutor to the appellate theory do not suffice to place the case before the jury, we reject the propriety of the Appeals Court's conclusion, despite § 2254(d).

As to the prosecutor's opening statement, we once again note that the context is not clearly that of the agency indictment, and moreover, that a reading of the statement simply does not communicate the appellate theory. Thus, although we are inclined to find no connection to the appellate theory, we are willing to adopt the generous·view of the district court that a nexus is "arguable." However, we again conclude that, as a matter of law, arguable or incidental references do not survive due process scrutiny, and that, accordingly, any presumption under § 2254(d) is soundly overcome.

We now come to our second point, which addresses a "factual" finding substantially relied upon by the Appeals Court and the district court below. In short, both courts (and especially·the Appeals Court) concluded that admitted flaws in the prosecutor's presentation and the judge's charge could

be overcome by "ample evidence" supporting the appellate theory. Thus, assuming we accept the factual contention of ample evidence supporting the appellate theory, the legal issue is whether, given such ample evidence, due process would be preserved despite a presentation by the prosecutor and instruction by the judge that do not clearly *relate* such facts to the appellate theory.

As a preliminary matter, we note our disagreement with any contention that there was "ample" evidence supporting the appellate theory. In the total context of the trial, reference to the bankruptcy proceeding—and especially, to Cola's nonobjection to the removal of the trustee (the act of dual representation)—was at best limited, especially when compared to the voluminous discussion of the loan transactions. Even accepting, however, the Appeals Court's finding of ample evidence, we do not, under the circumstances of a flawed relation of such facts to the appellate theory of guilt, regard due process as having been preserved.

■ The question, as noted above, was answered by the Supreme Court in *Dunn*. There, the Court noted that while evidence fully supporting the appellate theory had been before the jury, the prosecution had not "built its case" on such evidence. *Dunn, supra* 442 U.S. at 107, 99 S.Ct. at 2194. Accordingly, noted the Court, the offense had not been *defined* in terms of the appellate theory, and hence, the presence of such unexplained evidence would not reinstate due process. *Id.*[19]

**19.** The above statements of the *Dunn* court are not only the rule, but they are good policy. The Appeals Court implicitly adopts a rule that, where there is more than sufficient evidence of guilt before the jury, we can presume the jury to have discarded the erroneous theories of guilt offered by the prosecutor and judge. In short, this means that we can presume the jury to have divined the appellate theory from the facts. The problem with this view, however, is the serious risk involved that the jury did *not* so divine the appellate theory, and instead, that it convicted based on the erroneous or noncriminal theories before it.

So, because the sixth amendment requires that guilt be initially determined at the trial level, and because mere incidental or unexplained references by the prosecutor to the appellate theory do not assure that the conviction was so decided, the Supreme Court has decided that, under such circumstances, the better presumption is one of a conviction for noncriminal conduct. *See Chiarella, supra,* 445 U.S. at 237 n. 21, 100 S.Ct. at 1119 n. 21. Likewise, we feel compelled to reject any presumption of juror ability to divine from the facts appellate theories unarticulated at trial. Rather, we regard it as incumbent upon the *prosecution* to present its case, and this in a manner consonant with subsequent appellate affirmances.

Because we find that the prosecution in Cola's trial did not build its case on the evidence supporting the appellate theory, and, because we therefore find such evidence to have been left unexplained, the presence of such evidence is irrelevant to the due process violation here. Accordingly, we reject as immaterial any § 2254(d) presumption with respect to the Appeals Court's finding of ample evidence. Likewise, we reject as erroneous the apparent legal conclusion of the Appeals Court that the alleged ample evidence here could cure the failure of the prosecutor to relate such evidence to the appellate theory.

Based on our independent review of the record, we therefore conclude that the prosecutor's opening statement, his closing statement and the judge's charge to the jury, *when compared to the appellate theory of guilt on the agency indictment*, are simply not the same. Rather, the central theme of each principal stage, and indeed, the central theme of Cola's trial, was an agency conviction based on the loan transactions. Reference to the bankruptcy proceeding, while clearly present, was made in the context of the financial interest indictment. At best, a nexus between the agency indictment and the bankruptcy proceeding was amorphously offered in passing, so that the jury would somehow divine, and independently articulate, the appellate theory. The evidence at trial corroborating the appellate theory was left, unfortunately, in a similar limbo. The Appeals Court, in our view, fundamentally misinterpreted the factual and legal significance of the proof and principal stages of trial. Thus, we reject the Commonwealth's contention that any presumption under § 2254(d) is not overridden.

### 4. *Application of the harmless variance doctrine*

The traditional variance analysis [20] offered by the Commonwealth here involves three notable elements. First, the variance spoken of is a variance between the indictment and the proof at trial. Thus, because the foremost purposes of indictments are notice and protection from retrial for the same offense, courts have concluded that the presence of either element would render the variance "harmless" or not fatal. The second notable element of this harmless variance doctrine follows from the very possibility of harmlessness; in short, the presence of a variance between the indictment and the proof at trial does not constitute per se error. Third and finally, perhaps because variances between indictments and proof at trial are not regarded as per se error, the burden of proof as to error has been placed on *defendants*, who must not only show that the variance exists but also that the variance is "fatal." To establish such fatal error, defendants must establish either lack of notice and opportunity to defend, or lack of double jeopardy protection. Accordingly, the ability to prove either element renders the variance fatal.

The Commonwealth's fourth argument for denying Cola's habeas petition thus involves the following claim: the *Dunn* decision, since it also mentions the indictment as narrowed by the bill of particulars, can be approached under the harmless variance doctrine, whereby a finding of either (i) adequate notice and an opportunity to defend or (ii) the ability to invoke double jeopardy protection upon retrial, would preclude due process challenges to an appellate theory of guilt not set forth at trial. In other words, the Commonwealth appears to be arguing that, even assuming

---

**20.** This doctrine, known as the harmless variance rule and reflected in Fed.R.Crim.P. 52(a), originated in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). *Berger* involved application of the "harmless error statute," § 269 of the Judicial Code as amended (28 U.S.C. § 391), to variances between the indictment and proof at trial. The harmless error statute provides as follows:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

the prosecution did not present the appellate theory of guilt to the jury (and hence, that the appellate theory "varied" from the theory at trial), such a flaw would not be fatal due to indications of either (i) Cola's *awareness* of and adequate defense against the charge that he was being charged for wrongdoing at the bankruptcy proceeding, or (ii) the fact that Cola is *protected,* under the double jeopardy clause, from being retried for his actions in the bankruptcy proceeding.[21]

We begin by acknowledging a similarity between *Dunn* and the typical variance case. Each involves inquiry as to whether a certain formal statement or rationale of guilt—respectively, the pretrial indictment as narrowed by the bill of particulars or the post-trial ground for appellate affirmance—corresponds to the actual events at trial, and hence, to the probable determinations of the jury. In each case, the policy of adequate notice is clear. Without specification in the indictment, we cannot be sure defendants have been *aware* of, and hence able to defend against, the government's charge at trial. And, without specification at trial of the appellate theory, we can neither be sure that defendants ever *recognized,* much less defended against, the final government rationale of guilt.

In our view, however, the latter situation raises more than notice problems. For it is not only unclear that defendants adequately defended, but it is further unclear that they were ever so tried. In short, cases such as *Dunn* raise sixth amendment problems of whether defendants have ever been presented with an opportunity to confront, in a fact-finding forum, the government's final theory of guilt. Further, it is not clear whether an opportunity has been provided to have guilt determined by a jury in the first instance. Accordingly, given that variances between the appellate theory and the proof at trial raise not only fifth amendment notice problems but fundamental sixth amendment issues of confrontation and trial by jury, we have strong reservations against unquestioning application of the harmless variance doctrine.

Our conclusion that the harmless variance doctrine may be here constitutionally inapposite is bolstered by the apparent rejection by the Supreme Court, in *Dunn* and *Chiarella,* of typical variance analysis in favor of a per se rule. In *Dunn,* the Court specifically noted that, because both the indictment and the proof at trial focused on noncriminal conduct, variance was not the problem. Thus, because the *Dunn* 'Court regarded the appellate *de novo* theory as offending "the most basic notions of due process," it reversed the Tenth Circuit and, by implication, rejected the Tenth Circuit's conclusion that the "variance" complained of in *Dunn* could be approached under harmless variance analysis. *See Dunn, supra,* 442 U.S. at 105–07, 99 S.Ct. at 2193–95.

In *Chiarella,* likewise, the Court made no reference to traditional variance analysis. Rather, once the Court found a discrepancy between the appellate theory and the theory at trial, it concluded that affirmance would be impossible. *Id.,* 445 U.S. at 236–37, 100 S.Ct. at 1118–19. This, in our view, appears to be a per se rule.

Despite our inclinations to here declare a per se rule, we leave resolution of the issue for another day. Instead, we reject the Commonwealth's claim according to the same harmless variance analysis under which it is offered. In short, because we find (i) that proof of *either* lack of notice *or* lack of double jeopardy protection renders a variance fatal, and (ii) that Cola had no notice of the appellate theory of guilt, we accordingly conclude the "variance" here not to be harmless, and hence, to require issuance of Cola's writ.

---

**21.** Presumably because the Commonwealth is aware of the strong due process language in *Dunn* and its progeny, it does not openly assert that the burden would be on Cola to establish the "variance" here to be fatal. Apparently, under the Commonwealth's view, the "presence" of either notice or double jeopardy protection, here established by the Commonwealth, would suffice to render the variance "harmless."

Prior decisions of this Circuit may generate uncertainty as to whether, in alleging a variance to be fatal, defendants must show lack of notice *and* lack of double jeopardy protection. *U.S. v. George,* 752 F.2d 749, 753–54 (1st Cir.1985); *U.S. v. Drougas,* 748 F.2d 8, 17 (1st Cir.1984); *U.S. v. Flaherty,* 668 F.2d 566, 582 (1st Cir.1981). Given that each element—notice and double jeopardy protection—involves "substantial rights," we hereby clarify that defendants need only show *either* element to be absent so as to render a variance fatal. *U.S. v. Harrell,* 737 F.2d 971, 981 (11th Cir.1984); *U.S. v. Kramer,* 711 F.2d 789, 795 (7th Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983); *U.S. v. Heimann,* 705 F.2d 662, 669 (2nd Cir.1983); *U.S. v. González,* 661 F.2d 488, 492 (5th Cir. Unit B 1981); *U.S. v. Francisco,* 575 F.2d 815, 819 (10th Cir.1978); *U.S. v. Anderson,* 532 F.2d 1218, 1227 (9th Cir.1976), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1977); *U.S. v. Cosby,* 529 F.2d 143, 146 (8th Cir.1976); *U.S. v. Somers,* 496 F.2d 723, 745 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).

As to whether Cola has here established a lack of notice and opportunity to defend, the Commonwealth makes two related assertions. First, it argues that Cola received actual notice of the appellate theory in the indictment and that, regardless of the proof at trial, such notice in the indictment satisfies *Dunn.* We have rejected both aspects of this contention above. Second, the Commonwealth argues that, even assuming a lack of notice in the indictment, notice as to the appellate theory can nonetheless be inferred from Cola's alleged adequate defense to such theory at trial. For the reasons stated below, we also reject this second claim.

An examination of the record reveals Cola's defense to have been largely, if not wholly, directed to the prosecution theory that the loan transactions constituted the illegal acts of agency under the Massachusetts statute. With respect to the $30,000 loan transaction, Cola's defense amounted to repeated assertions that it was his wife, and not he, who orchestrated the loan.

Moreover, Cola asserted that if he acted as anyone's agent, it was his wife, and not Rapp, who was the principal. Finally, as to the $10,000 transaction, Cola reported that he acted on behalf of Volpe, not Rapp.

The only aspect of Cola's defense that approaches cognizance of the appellate theory was his claim, elicited both on direct and cross examination, that he did not represent the Commonwealth's interests on his lunch hour. This lunch hour defense clearly addresses the appellate theory, and rebuts other evidence offered by the prosecution regarding Cola's representations to the judge at the bankruptcy proceeding.

The problem, however, with this defense is the same problem with the Commonwealth's assertions regarding ample evidence of guilt. In short, when Cola's lunch hour defense is compared to his voluminous and repeated other assertions, it becomes evident that his lunch hour statements were largely impromptu rebuttals that, in our view, hardly indicate meaningful notice of the appellate theory. Accordingly, because we regard these isolated statements of Cola's to be incidental to his defense, the Commonwealth's assertion of notice to Cola and an adequate opportunity to defend is hereby rejected.

Given our conclusion that Cola has established lack of notice as to the appellate theory, we need not address whether Cola could establish the lack of double jeopardy protection against retrial for his actions at the bankruptcy proceeding. The lack of notice here, under harmless variance analysis, suffices to violate due process. Accordingly, although we note our inclination to declare a per se rule with respect to the "variance" involved in this case, we nonetheless conclude that, even applying harmless variance analysis, the Commonwealth's contentions of due process must be rejected.

For the reasons stated above, the judgment of the district court below is reversed with instructions to forthwith issue a writ of *habeas corpus* to petitioner.

BAILEY ALDRICH, Senior Circuit Judge, concurring.

With great respect to the court, whose opinion I do not fault, I wonder whether I might profitably say that I would be less generous to the Commonwealth. With the thought that not merely as a moral, but as a constitutional matter of due process it is the function of a bill of particulars to identify rather than conceal the claimed offense, I cannot read paragraph 2 of the bill[1] as fairly adverting to two of the three matters, which I label A & B, that the Appeals Court cites as being criminal, although the evidence might well have supported them.

A. Cola's role as a secret agent for Rapp at the Bankruptcy Court proceedings was more malignant than the role of a disclosed agent because the Bankruptcy Court judge was not alerted to having to weigh Cola's recommendations in the light of Cola's role on behalf of Rapp. (468 N.E.2d 1102).

B. Cola participated in the scheme to extricate S & S from the control of the trustee in reorganization. (*Id.* at 1103).

I do not understand the Appeals Court's rescuing the Commonwealth by finding evidence supporting these points; this is a criminal, not a civil proceeding where unobjected-to evidence may effect amendments.

Even if it were legally possible for a bill to be enlarged by the prosecutor's oral claims as to the issues, at least these should be sharply focused. If by a (too liberal, I think) interpretation it could be said that the prosecutor made point B in his closing argument, he clearly did not refer to A in either opening or summation. And I cannot find that the court, in its charge, referred to either.

The third factual ground on which the Appeals Court held a conviction could be sustained was with respect to certain actions apart from the bankruptcy trustee's removal—allegedly dual agency acts impeding the Commonwealth's getting paid. It found such covered by the third portion of particular number 2. (n. 1, ante). Even if that language could be taken to cover "filing returns ... calculated to keep the tax collector at bay ... and passing up opportunities to apply the loan proceeds to the reduction of tax arrearages," (468 N.E.2d at 1101), it would be very difficult so to read the only part of the charge that referred to defendant's dual agency conduct. The court charged,

Now, here again we have got the state employee, and we have got the particular matter in which he as an employee is involved, and that is, no question about it, the collection and payment of taxes. The question is: Are you satisfied beyond a reasonable doubt that while involved in that he acted as an agent for anyone, which would be Rapp or the S and S, in connection with that matter?

And you have heard the attorneys argue that indictment to you. *It has to do with the loan,* ... (Emphasis supplied).

I believe any jury would be brought up sharp to take the last 18 words as describing what was meant by those preceding, viz., as referring to the loan, of which much had been made.[2] Yet the loan was not an offense under the agency indictment. The court said this flatly at p. 1101, and described that claim subsequently as "faulty."

Thus we have a situation where a number of disputed evidentiary matters were presented during the trial itself, with great doubt as to whether some were adequately

---

**1.** 2. The defendant acted as an agent for Framingham Food Services, Inc. in granting a second mortgage to Utopia Realty Trust. The defendant acted as agent for Michael Rapp in obtaining a loan from one John Volpe. The defendant acted as agent for Framingham Food Services, Inc. in the payment of debts of the corporation, other than to the Commonwealth.

**2.** Actually, I must wonder *what* the jury understood. The question addressed to the court during deliberations suggests total confusion.

"If, now that we have heard all the testimony and the charge to the jury, are we free to decide guilt or innocence on any basis whatsoever (except, of course, for being paid off for a vote)?" The court's negative response did nothing to illuminate.

charged, but with one matter, the loan, which the Appeals Court ruled was not an offense, clearly instructed upon. Thus, the jury was either given one, bad, claim, or one bad and one or more good ones, and the verdict fails to show that it chose a good one. *See Chiarella v. United States,* 445 U.S. 222, 237 n. 21, 100 S.Ct. 1108, 1119 n. 21, 63 L.Ed.2d 348 (1980). On either basis this was fundamentally unfair.