******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom PALMER and McDON-ALD, Js., join, dissenting. I respectfully disagree with the majority's decision to reverse the judgment of the Appellate Court, which had overturned the convictions of the defendant, Robert King, of two counts of intentional and reckless assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and (3),[1] on the ground that they were based on a legally inconsistent verdict that did not reflect the theory of the case that the prosecutor had presented to the jury at trial. *State v. King*, 149 Conn. App. 361, 373–76, 87 A.3d 1193 (2014). Our recent decision in *State* v. *Nash*, 316 Conn. 651, 665–69, 114 A.3d 128 (2015), constrains me to agree with the majority's ultimate conclusion in part I of its opinion that the defendant's convictions for both intentional and reckless assault are—at least conceptually—not legally inconsistent under the state's theory of the case that was presented at trial,[2] namely, that the defendant stabbed the victim, Kristen Severino, four times in a single episode when she interfered in a fight between the defendant and her friend, Kyle Neri, over a $10 debt.[3] I nevertheless disagree with part II of the majority's opinion, which concludes that the convictions for both intentional and reckless assault did not violate the defendant's due process right to notice under the theory of the case principles articulated in *Dunn* v. *United States*, 442 U.S. 100, 106, 99 S. Ct. 2190, 60 L. Ed. 2d 743 (1979), and *State* v. *Robert H.*, 273 Conn. 56, 82–83, 866 A.2d 1255 (2005). I agree with the defendant's claim that the record, and in particular the prosecutor's closing and rebuttal arguments, demonstrates that the state presented its case to the jury in a manner that hedged its bets with respect to the defendant's mental state, and did not contemplate obtaining convictions for both intentional and reckless assault. Like the Appellate Court, I conclude that the convictions of both intentional and reckless assault ran afoul of due process principles holding that "an appellate court cannot affirm a conviction on the basis of an argument newly fashioned after conviction and not presented at trial." *State v. King*, supra, 373. Because I would affirm the judgment of the Appellate Court, I respectfully dissent.

I agree with the background facts and procedural history stated by the majority and I need not repeat them in full here. I also agree with the majority's general recitation of the applicable constitutional principles governing the due process issue in this appeal, namely, whether the defendant received constitutionally adequate notice under *Dunn* v. *United States*, supra, 442 U.S. 106, that the state sought to convict him of both reckless and intentional assault. In principles first articulated in the context of sufficiency of the evidence claims,[4] we have emphasized the "important doctrine"

precluding the state from "chang[ing] the theory of the case on appeal." *State* v. *Robert H.*, supra, 273 Conn. 82. "The 'theory of the case' doctrine is rooted in principles of due process of law. . . . In *Dunn*, the United States Supreme Court explained: 'To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.' . . . The court further stated that 'appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial.' . . . Subsequently, in *Chiarella* v. *United States*, 445 U.S. 222, 237 n.21, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980), the United States Supreme Court observed that an isolated reference at trial to the theory of the case advanced on appeal is constitutionally insufficient to sustain a conviction on appeal.

"The [United States] Court of Appeals for the First Circuit applied the *Dunn* principles in *Cola* v. *Reardon*, 787 F.2d 681 (1st Cir.), cert. denied, 479 U.S. 930, 107 S. Ct. 398, 93 L. Ed. 2d 351 (1986), a federal habeas action . . . . In *Cola*, there was evidence in the record that would have been sufficient to sustain the petitioner's conviction, but the Court of Appeals held that the state appellate court should not have considered that evidence in support of the conviction because it was not part of the state's theory of the case at trial. . . . In reaching that result, the Court of Appeals interpreted *Dunn* and its progeny as follows: '[I]n order for any appellate theory to withstand scrutiny under *Dunn*, it must be shown to be not merely before the jury due to an incidental reference, *but as part of a coherent theory of guilt that, upon* [*review of*] *the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense.*' . . . We conclude that this statement is an accurate synthesis of *Dunn* and *Chiarella*. We therefore adopt it as the standard by which to gauge whether evidence introduced at trial, but not relied on by the state in its legal argument, is properly cognizable by an appellate court when evaluating the sufficiency of the evidence." (Citations omitted; emphasis added.) *State* v. *Robert H.*, supra, 273 Conn. 82–83. In evaluating whether a coherent theory of guilt is properly before the jury during the principal stages of the trial, we conduct a wide-ranging review of the charging instrument, the jury instructions, witness examinations, and the prosecutor's factual and legal arguments, such as summations and responses to dispositive motions. See, e.g., *Cola* v. *Reardon*, supra, 693–94; *State* v. *Carter*, 317 Conn. 845, 854–55, 120 A.3d 1229 (2015); *State* v. *Fourtin*, 307 Conn. 186, 208–209, 52 A.3d 674 (2012); see also footnote 9 of this dissenting opinion.

I respectfully disagree with the majority's conclusion

that the state tried this case in a way that apprised the defendant that the state intended to obtain convictions for both reckless and intentional assault. See *State* v. *Nash*, supra, 316 Conn. 666–67 ("[i]n light of the state's theory of the case, there was nothing to preclude a finding that the defendant possessed both of these mental states with respect to the same victim at the same time by virtue of the same act or acts"). I begin by acknowledging that, although the substitute information and jury instructions do not specifically describe reckless and intentional assault in the first degree as charges in the alternative, they similarly do not specifically state that the jury might be asked to return a guilty verdict on both counts.[5] The remainder of the record demonstrates, however, that the state presented its theory of the case to the jury in the alternative with respect to the applicable mental states, which bars it from arguing otherwise to save the convictions on appeal.[6] In particular, after discussing the events leading up to the defendant's act of stabbing the victim, the prosecutor argued in her summation that: "I have two charges. . . . The first is assault in the first degree with a dangerous instrument. . . .

"In both charges, the state has to prove that it's [the defendant] that was involved; the second element, the intent to cause serious physical injury. . . .

"Intent to cause serious physical injury: the things that—in the testimony that you heard, are the use of a knife. Now, no one says that [the defendant] gets a pillow, a spatula, a butter knife; he gets a steak knife, something that you commonly use to cut something more difficult than say, butter or peanut butter, or something like that. They all talk about the thrusting motion, all . . . said a thrusting motion, at least three times, in the direction of [the victim].

"You heard that [the defendant] came in and says, my name is—I'm Black Rob. They call me Black Rob for a reason, because I kill people. Why does that matter? That's what is—he's trying to scare everybody. He's ranting at [Neri] over this money. He comes in and is angry. And if you look at [the defendant's] statement . . . you will read where he says, 'I was pissed. After [Neri] was pointing the gun at me, I was real pissed.' He's angry. [The victim] says, 'It felt like I was being punched in the stomach.' Those are things that you can use to cause—use to factor in intent to cause serious physical injury."

After arguing that the evidence satisfied the "serious physical injury" and "dangerous instrument" elements with respect to the intentional assault charge, the prosecutor stated: "Now there's the second charge, assault one, reckless indifference: a conduct creating a risk of death, recklessness, extreme indifference to human life and causes serious physical injury.

"*You may be wondering why there are two charges. You have a variety of evidence to draw from and I don't know what you'll find credible. If you find [the defendant's] statement credible, he's saying he's waving the knife around, he's angry with [Neri], and [the victim] jumps in the middle, if you believe [the defendant's] statement you would look more to the assault one, reckless indifference.*"[7] (Emphasis added.)

The prosecutor did not discuss the concept of reckless indifference in any detail, and instead went on to argue about the credibility of the testifying witnesses and the defendant's statement to the police. The prosecutor then concluded her closing argument by stating that: "I believe after the six of you deliberate, hear the judge's instructions, and apply the facts of the case as you've heard them, you will find [the defendant] guilty beyond a reasonable doubt of assault in the first degree, dangerous instrument."

In her rebuttal argument, the prosecutor again did not argue the concept of recklessness in any detail, but instead responded to the defendant's proffered theory of self-defense by arguing that the version of events set forth in the defendant's statement gave rise to the duty to retreat, thus defeating his justification of self-defense.[8] The prosecutor also argued that there was no evidence of a gun, as claimed in the defendant's statement, and that the defendant's self-defense justification was unbelievable, asking: "Does [it] make any sense . . . to protect yourself from a gun with a knife?"

The prosecutor continued: "Yes, [the victim] said it was an accident. I got in the middle of things. She got in the middle of [Neri] and [the defendant]. She tried to diffuse the situation. 'No one needs to die tonight,' and she got stabbed. She put herself in the middle of that situation, not—not literally in the middle of the knife-swinging, but she says I put myself in the middle of something."

Ultimately, the prosecutor concluded her rebuttal argument by stating that: "*I believe we have proven to you beyond a reasonable doubt assault first with a dangerous instrument.*" (Emphasis added.)

I conclude that there is nothing in the prosecutor's summation that remotely hints that the state presented to the jury a "coherent theory of guilt . . . in a focused or otherwise cognizable sense"; (internal quotation marks omitted) *State* v. *Robert H.*, supra, 273 Conn. 83; that the defendant was guilty of *both* intentional and reckless assault. Beyond the prosecutor's explanation before the jury of why there were two charges in this case, which is a statement that plainly contemplates a case charged in the alternative depending on the jury's finding as to the applicable mental state, her statement with respect to the state's desired verdict indicates just such a unitary view of the case. The prosecutor did not

ask for a conviction on "both" or "all counts," and her description of the verdict desired was in the singular insofar as she concluded both her closing and rebuttal arguments by asking the jury to convict the defendant of "assault in the first degree, dangerous instrument" and "assault first with a dangerous instrument" respectively. Moreover, the prosecutor paid minimal attention to the recklessness charge, and did not spend any time describing the elements of the offense of reckless assault in an attempt to relate them to the evidence in the record; it appeared to be a mere afterthought. Thus, I believe that the majority stretches the word "ambiguous" beyond all comprehension when it uses it to describe the prosecutor's closing argument, and calls it "difficult . . . to draw any definite conclusions from the closing argument regarding the state's theory of the case."

The majority acknowledges that a "[s]ummation . . . can often provide a reviewing court with needed clarity in those cases where the state's theory at trial is not clear upon review of the other factors." The majority's actual willingness to relieve the state from the theory put forth in its closing arguments is, however, at drastic odds with nearly one decade's worth of case law since *State* v. *Robert H.*, supra, 273 Conn. 83, which applies the due process principles of *Dunn* v. *United States*, supra, 442 U.S. 106–107.[9] For example, in *State* v. *Fourtin*, supra, 307 Conn. 188, we considered whether there was sufficient evidence of "physical helplessness" to sustain a defendant's conviction for attempt to commit sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (3). In particular, we determined "whether, at the time of the alleged sexual assault, the victim was physically able to convey a lack of consent or unwillingness to an act." Id., 207. We held that the theory of the case doctrine barred the state from making an appellate argument that the severely disabled victim's acts of biting, scratching, screeching, kicking, or groaning were not communicative, and were " 'merely emblematic of her multiple disabilities,' " reasoning as follows: "*At no time during the trial, including* cross-examination, *closing argument or rebuttal,* did the state challenge or dispute testimony establishing that the victim communicated displeasure through biting, kicking, scratching, screeching or groaning. Indeed, the state itself elicited much of this testimony, albeit in an attempt to establish for the jury that the victim was credible and perfectly capable of communicating her likes and dislikes. Nor did the state contend or otherwise suggest that these behaviors were simply manifestations of the victim's disabilities rather than volitional, communicative acts intended to express displeasure. Likewise, the state did not proceed on the theory that the victim's behaviors merely reflected generalized anger or frustration.

"To the contrary, *the prosecutor expressly told the*

*jury during closing argument that the victim*, 'according to all accounts, was very vocal, very active, and, if in fact she felt that . . . [people were not understanding] what she was saying, I believe [that] everybody [who has] testified here [has indicated that] she would throw up her arms and say "stop." ' *During closing argument*, the prosecutor also noted that the victim was 'very limited in terms of . . . what type of information she can pass on to you,' and that she had 'some difficulty expressing herself . . . .' At no time, however, did the state even raise the notion that the victim was unable to communicate an unwillingness to an act." (Footnote omitted; emphasis altered.) Id., 208–209.

Similarly, in *State* v. *Carter*, supra, 317 Conn. 855, we recently observed that "neither the substitute information nor the court's instructions to the jury identified the target of the attempt to commit assault charge" arising from his act of pointing a gun at a police officer. We relied, however, on the state's closing argument as "conclusively demonstrat[ing]" its theory of the case, namely, that the police officer was the person "at whom the defendant's intent was directed." Id. We observed that the Appellate Court's view that the case was a theory of mistaken identity or transferred intent arising from the defendant's previously stated intention to shoot a " 'white dude' " in a bar was "a narrative in direct conflict with the one advanced in the state's closing argument." Id., 855–56; see also id., 856 (not considering whether Appellate Court's apparent theory of case doctrine violation required reversal of conviction because evidence was "sufficient to demonstrate the defendant's intent under the theory that the state argued to the jury"); *State* v. *Webster*, 308 Conn. 43, 57–59, 60 A.3d 259 (2013) (reviewing closing argument to determine whether state improperly raised theory of course of conduct leading to narcotics sale, rather than actual physical transfer, to sustain conviction of sale of narcotics). The majority's restrictive application of the theory of the case doctrine is, therefore, inconsistent with this court's actual practice in the decade since it decided *State* v. *Robert H.*, supra, 273 Conn. 83.[10]

Guided by these recent Connecticut cases applying the theory of the case doctrine in connection with the state's closing arguments, I conclude that the state presented the charges of reckless and intentional assault to the jury as alternatives, rather than in an effort to obtain multiple convictions arising from the same act. As the defendant aptly observes, the state adopted a trial strategy in which it primarily argued that the defendant had "intentionally stabbed the victim four times," but "hedged its bet" by positing that, "even on [the defendant's] version of the stabbing (which the state hotly disputed), he recklessly assaulted the victim." Accordingly, I agree with the Appellate Court's conclusion that the theory of the case doctrine precludes the

state from advancing arguments on appeal that would save the defendant's convictions from reversal.[11] See *State* v. *King*, supra, 149 Conn. App. 374–75.

I would, therefore, affirm the judgment of the Appellate Court. Accordingly, I respectfully dissent.

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[2] I emphatically disagree with the majority's legal inconsistency analysis to the extent that it relies on a factual predicate, embraced by the trial court in ruling on the defendant's postverdict motions, that the victim's four stab wounds resulted from two separate acts by the defendant, the first act inflicting one wound recklessly, followed by an intentional act that inflicted three more wounds. In my view, consideration of this multiple act factual predicate is purely academic in light of the state's actual theory of the case. Specifically, I agree with the Appellate Court's conclusion, not challenged by the majority, "that the evidence was not presented at trial in a manner suggestive of more than one assault. In order to affirm the defendant's conviction, we would have to find that the prosecutor presented the stabbing as two offenses; one committed intentionally and another committed recklessly. Nothing in the record supports such a conclusion." *State* v. *King*, supra, 149 Conn. App. 374; see also id. ("[A]ll witnesses testified that the assault occurred quickly, within a short span of time and, essentially, as one continuous act. There was no testimony elicited at trial that there was any temporal break between knife thrusts or distinguishing one thrust from another in any manner."). Although I agree with the majority that the legal inconsistency and theory of the case issues in this appeal are doctrinally separate inquiries, I nevertheless agree with the defendant that, as a practical matter, the legal consistency of the verdict must be considered in light of the state's theory of the case at trial. In my view, the Appellate Court's analysis reflects that reality, rather than use a kaleidoscopic lens of post hoc rationalization that runs far afoul of the due process theory of the case principles set forth in, for example, *Dunn* v. *United States*, 442 U.S. 100, 106–107, 99 S. Ct. 2190, 60 L. Ed. 2d 743 (1979), and *State* v. *Robert H.*, 273 Conn. 56, 82–83, 866 A.2d 1255 (2005). See *State* v. *King*, supra, 372–74.

[3] I note that the Appellate Court decided this case without benefit of our recent decision in *State* v. *Nash*, supra, 316 Conn. 668, which rejected a defendant's argument "that two convictions are mutually exclusive if they require the jury to find that a defendant simultaneously acted intentionally and recklessly and, in doing so, caused the same result to the victim." We concluded instead that "[t]he relevant inquiry in determining whether two convictions are mutually exclusive is whether the opposing mental states relate to the same result, not whether both convictions relate to the same injury." Id. In *Nash*, we held that the evidence and the state's theory in a case wherein the defendant retaliated against a person for spreading rumors about him by firing several shots into the second story of that person's home, striking that person's sister, supported convictions of both intentional and reckless assault in violation of § 53a-59 (a) (1) and (3). Id., 668–69. We concluded that "the defendant's convictions for intentional and reckless assault in the first degree are not legally inconsistent because the two mental states required to commit the offenses relate to different results. More specifically, in order to find the defendant guilty of those offenses, the jury was required to find that the defendant intended to injure another person and that, in doing so, he recklessly created a risk of that person's death. In light of the state's theory of the case, there was nothing to preclude a finding that the defendant possessed both of these mental states with respect to the same victim at the same time by virtue of the same act or acts. In other words, the jury could have found that the defendant intended only to injure another person when he shot into [the sister's] bedroom but that, in doing so, he recklessly created a risk of that person's death in light of the circumstances surrounding his firing of the gun into the dwelling." (Footnotes omitted.) Id., 666–67.

[4] These due process principles keep us from evaluating the sufficiency of the evidence in a "vacuum" when applying the "well established principles" that "when evaluating the evidence in support of a conviction, we generally

do not confine our review to only that evidence relied on or referred to by counsel during the trial. Rather, we construe all relevant evidence in the record, as well as the reasonable inferences drawn therefrom, in a light most favorable to sustaining the verdict. . . . Furthermore, we defer to the [fact finder's] assessment of the credibility of the witnesses based on its first hand observation of their conduct, demeanor and attitude. . . . We also assume that the fact finder is free to consider all of the evidence adduced at trial in evaluating the defendant's culpability, and presumably does so, regardless of whether the evidence is relied on by the attorneys." (Citations omitted; internal quotation marks omitted.) *State* v. *Robert H.*, supra, 273 Conn. 81–82.

[5] Beyond the simply stated substitute information, the trial court instructed the jury in relevant part that the defendant "is charged in two counts in the information. *That is legal language for saying that he's charged with two crimes*. In count one of the information, the defendant is charged with the crime of assault in the first degree in violation of [§ 53a-59 (a) (1)]. If you unanimously find that the state has proven beyond a reasonable doubt each of the essential elements of this crime and disproven beyond a reasonable doubt the justification of self-defense, you shall find the defendant guilty of the crime charged in count one of the information. If you unanimously conclude that the state has failed to prove beyond a reasonable doubt any of the elements of this offense or failed to disprove self-defense, then you shall find the defendant not guilty of the crime charged in count one.

"In count two of the information, the defendant is charged with the crime of assault in the first degree in violation of [§ 53a-59 (a) (3)]. If you unanimously find that the state has proven beyond a reasonable doubt each of the essential elements of this crime and disproven beyond a reasonable doubt the justification of self-defense, you shall find the defendant guilty of the crime charged in count two of the information. If you unanimously conclude that the state has failed to prove beyond a reasonable doubt any of the elements of this offense or failed to disprove self-defense, then you shall find the defendant not guilty of the crime charged in count two.

"When you return to the courtroom, *you will be asked whether the accused is guilty or not guilty of each of the crimes charged in the information* and whether your verdict is unanimous as to each charge." (Emphasis added.)

After providing this overview of the charges, the trial court then instructed the jury as to the specific elements of intentional and reckless assault in the first degree, without using any transitional language specifically instructing the jury that it could find the defendant guilty of either or both charges.

[6] I agree with the majority that the state intended to "try both charges in the substitute information," and that the information fulfilled its purpose of informing the defendant that he was charged with both intentional and reckless assault. I disagree, however, with the majority's criticism that I, reach an "unsupported conclusion" that improperly "discount[s]" the significance of the information and jury instructions on the ground that they "follow a similar format in every case," in a manner that "dramatically and unnecessarily narrow[s] the ken of our due process inquiry in this context." See footnote 8 of the majority opinion. Given the various interpretations that could be ascribed to the evidence adduced in this trial that supported either of the offenses charged, I view the prosecutor's summation as presenting her view of what the state ultimately hoped to accomplish at the trial, once the evidence was actually put before the jury.

[7] With respect to the defendant's statement, admitted into evidence through the testimony of a police detective, the prosecutor argued that the defendant had said: "[Y]es, I stabbed [the victim]. He talks about a gun. He's the only person that talks about a gun. And there will be a self-defense charge given, but the first thing you have to believe is did [Neri] have a gun? No one else says that but [the defendant] and he has an interest in the outcome of the case. . . . It's an uncorroborated explanation by [the defendant] after he's had time to think."

[8] The defendant advanced a theory of self-defense, positing that he picked up a knife to use in self-defense after Neri had threatened him with a gun during the dispute over the $10. The defendant argued that the evidence did not support the prosecution's argument that he "came [into the apartment] and automatically [stabbed the victim multiple times], because [she] didn't sit down quick enough," asking: "Does that make sense? Or does it make sense what [the defendant] said to the police the next day or that same day?" The defendant argued that the victim got "in the middle of it" and was stabbed when the defendant used a knife to defend himself from

the gun wielding Neri. The defendant emphasized that the more sensible version of the events was that this was not "an unprovoked stabbing" over $10, but that the fight, "where the apartment [was destroyed] and the dresser [was pushed] over and [the victim intervenes and] gets stabbed in the process," was "part of a larger . . . issue . . . ."

Relying on these facts, the defendant argued: "I want you to use your common sense when you think about this case, what the evidence was. Does it make sense that this was an unprovoked stabbing or does it ring true to what my client is telling you in his statement? Does that make more sense, that this was a brawl, a fight between [Neri] and my client, after [Neri] threatened him with a gun, and . . . that this was essentially an accident? She got in the middle. [The victim] got in the middle of [Neri] and [the defendant] and that's how she got stabbed. If you do that, I am confident that you will return a verdict of not guilty."

[9] I acknowledge the state's argument that cases such as *State* v. *Fourtin*, supra, 314 Conn. 209–10, which consider closing arguments to divine the theory of the case, are an improper extension of the theory of the case doctrine from *Cola* v. *Reardon*, supra, 787 F.2d 693–94. The state argues that the notice purpose of the doctrine requires the state to do no more than be consistent with the theories posited before the defendant puts on his case, such as through the substitute information, legal arguments in response to motions for judgment of acquittal, and confirming jury instructions. I disagree. First, the federal decisions that this court relied upon in *State* v. *Robert H.*, supra, 273 Conn. 82–83, reviewed the summations of the prosecutor and defense counsel, along with the charging instrument and jury instructions, to determine the prosecution's theory of the case. See *Dunn* v. *United States*, supra, 442 U.S. 106–107; *Cola* v. *Reardon*, supra, 693. Second, particularly in cases like this one, wherein the substitute information and instructions are fairly open-ended, adoption of the state's position in this appeal—which seemingly is endorsed by the majority's relegation of closing arguments only to a clarifying role—would leave prosecutors free to argue virtually anything in order to obtain a conviction and then save it on appeal, however factually or legally flawed the trial prosecutor's legal theory might be. Most significantly, it also would deprive the defendant of the crucial opportunity to identify and counter significant aspects of the state's case *before* the jury renders its verdict.

[10] Numerous recent decisions from the Appellate Court hold similarly. See, e.g., *State* v. *Davis*, 163 Conn. App. 458, 465–69,     A.3d     (2016) (noting lack of specificity in information and relying on closing argument to conclude that state's theory of murder case was accessorial liability or liability under *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 [1946], rather than liability as principal); *State* v. *James E.*, 154 Conn. App. 795, 834–35, 112 A.3d 791 (2015) (rejecting claim that state should be precluded from defending double jeopardy claim on appeal arising from two convictions of assault of elderly person by arguing that "there were two separate and distinct crimes" because, inter alia, "the prosecutor did not present the two . . . charges as alternatives during closing argument").

[11] The majority posits that the prosecutor's statement was "isolated" and "ambiguous," and that "[w]e have never held that a prosecutor's single, unclear statement during closing argument can deprive a defendant of his due process right to notice. For us to do so would grant a windfall benefit to the defendant completely incommensurate with the harm—if any—suffered due to a prosecutor's lack of clarity during closing argument. This is particularly apparent in the present case, where the prosecutor's statement was a comment on the law that the jury was to apply, and the trial court specifically instructed the jury that it was to rely on the statements of law pronounced by the trial court and not the attorneys." (Emphasis omitted.) I disagree with the majority's characterization of the state's argument as "isolated," "ambiguous," and a pure statement of the law. The prosecutor's closing arguments in this relatively simple case were short, with the initial summation occupying only seven pages of transcript and the rebuttal barely two pages. Thus, the prosecutor's sole, but clear, explanation of why the state pursued two charges against the defendant is not "isolated" given the relative brevity of this argument. Further, that portion of the prosecutor's argument was *not* a purportedly objective statement of the black letter law, which is, of course, the province of the trial court, but rather, an articulation of the state's strategy for obtaining a conviction even if the jury were to credit the defendant's statement or portions thereof.

Finally, I disagree that the defendant would obtain any kind of "windfall" as

a result of my conclusion. Insofar as the trial court sentenced the defendant concurrently on the two convictions, all the state had to do to avoid reversal on appeal was ask the trial court to vacate one of them in response to the defendant's postverdict motions, and the defendant would not have served one less day in prison. Cf. *State* v. *Nash*, supra, 316 Conn. 669–70 n.19 (noting that defendant did not raise double jeopardy claim and that trial court had merged intentional and reckless assault convictions, and had sentenced him only on intentional assault conviction); see also *State* v. *Miranda*, 317 Conn. 741, 755–56, 120 A.3d 490 (2015) (discussing use of contingent vacatur of convictions in lieu of merger as double jeopardy remedy). Second, subject to double jeopardy protections not at issue in this appeal, my conclusion does nothing to preclude the state from obtaining multiple convictions under the same statute potentially even for the same act, so long as the state actually pursues that strategy at trial. See, e.g., *State* v. *Wright*, 319 Conn. 684, 696, 127 A.3d 147 (2015) (state may obtain multiple convictions for aggravated sexual assault of minor for single act that violates General Statutes § 53a-70c [a] [1] and [6] without committing double jeopardy violation).

———————————————